Matter of J.R.W. v L.F.W. (2005 NY Slip Op 50612(U))

[*1]

Matter of J.R.W. v L.F.W.

2005 NY Slip Op 50612(U)

Decided on April 18, 2005

Family Court, Nassau County

Lawrence, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on April 18, 2005

Family Court, Nassau County
In the Matter of a Proceeding Under Articles 8 of the Family Court Act J.R.W., Petitioner,
 Respondent.
In the Matter of a Proceeding Under Articles 6 of the Family Court Act J.R.W., -against-
against L.F.W., Respondent.
In the Matter of a Proceeding Under Articles 6 of the Family Court Act L.F.W.,Petitioner, -against-
 J.R.W., Respondent.
In the Matter of a Proceeding Under Articles 6 of the Family Court Act J.R.W.,Petitioner, -against-
against L.F.W.,Respondent.
O-

Richard S. Lawrence, J.
The captioned matters were the subject of extensive hearings before this Court, which hearings commenced September 10, 2003 and concluded on October 26, 2004. (For purposes of convenience, this Court has, in the captions at the beginning of this decision and order, denominated the various matters heard as actions 1 - 4.) At the conclusion of testimony, counsel requested the right to file post-trial memoranda. All memoranda have now been received by the Court.
Action #
1 is a petition filed by the Father requesting an extension of a prior order of protection of this Court for an additional three years. Since that filing, the Court has issued a series of temporary orders of protection, in effect temporarily extending the prior final order of protection. The most current order is dated January 3, 2005 and is due to expire July 3, 2005.
Action #
2 is a petition by the Father requesting a modifi-cation of a prior order of this Court and in which the Father requests that all visitation to the Mother be suspended as to both children.
Action #
3 is a petition brought by the Mother, also requesting a modification of this Court's order of visitation in which she
claims that the Father is alienating the children from her and in which she requests that the Father undergo therapy and that she be given the children's school records and samples of their school-
work through the current visitation facility.
Action #
4 is a contempt proceeding against the Mother pursuant to an order of this Court dated September 15, 2003, based upon allegations that she violated this Court's temporary order of custody and visitation dated April 23, 2003, which required her to "immediately enroll in and cooperate with TASC," and the report given to this Court by TASC dated September 9, 2003, which alleges that the Respondent/Mother "no longer wishes to participate with TASC " and that Respondent believes that "since [*2]she is on probation there is no need to comply with TASC."
The parties are parents of two children: Brian born April 14, 1988 and Carol born December 13, 1992. Placed into evidence as Court exhibits were the following:
Court exhibit I is a final order of custody and visitation dated August 29, 2002, giving legal and physical custody of the children to the Father and allowing therapeutic visitation between the minor children and the Mother at Visitation Alternatives, Inc.;
and Court exhibit II is a corrected final order of protection dated May 18, 2000, by the Judge, now retired, who previously heard other matters between these parties, in which there was a hearing which resulted in an affirmative finding on behalf of the Father and against the Mother. That order stated that the Mother was to stay away from the Father and both children, including their persons, home, school and camp, and wherever they may be; refrain from domestic violence crimes (Family Court Act §812) as to all three persons; and refrain from communication as to all three persons. That order from the prior Judge further found the existence of aggravating circumstances; however, the order fails to specify the specific aggravating circumstances in accordance with FCA §§827 and 842. This Court is well aware that a finding of aggravating circumstances requires a specific finding of the nature of such aggravating circumstances in accordance with these statutes and that otherwise it is reversible error. However, to this Court's knowledge, it appears that there was never any appeal of that order. Therefore, that order of protection remained in effect until May 18, 2003.
For purposes of exhibits, the Father was the Petitioner and the Mother was the Respondent.
 FATHER'S TESTIMONY
The parties were married on May 31, 1986, and the divorce com-
menced approximately mid-1998, resulting in a judgment of divorce approximately September 1999. Since the divorce, the Mother has had only supervised visitation, initially with Dr. Peter Favaro at Smart Parenting, which thereafter resulted in a stoppage of all visitation. Subsequently, there was supervised visitation [*3]pursuant to court order (the order of August 29, 2002) at Visitation Alternatives, Inc.
The Father states that he brought these proceedings because the children have been upset during visitation at both places and that sometimes the children refuse to visit, although the Father states he "encouraged" the children to go to visitation. At this point, the Father wants all visitation to end, and requests an extension of the current order of protection against the Mother. He states that for all six years since the divorce commenced there has always been an order of protection against the Mother.
The Father brought the children to every single visit at Visitation Alternatives and he and the children have been in
counseling and remain in counseling. The Father has never made any negative comments about the Mother to the children, although he has told the school personnel about the Mother' alcoholism. Initially, he agreed to visitation, but it was suspended on October 25, 2001, because "the children did not want it."
On cross-examination by the Law Guardian, the Father testified at length as to adverse physical manifestations exhibited by the children after visitation. Visitation was almost always at 7:00 p.m. until 8:00 or 8:30 p.m. After each visitation, the children sometimes could not go to school the next day. Brian would have headaches for which the Father took him to a pediatric neurologist and "Carol had a twitch on her nose" and would act out at school and had stomachaches. Carol's twitches would start the day of visitation (in anticipation of the visitation later that day). The teachers of both children called the Father with their concerns.
After each visitation, Brian would go right to bed until the next morning, which is something he otherwise never did.
The Father would bring a copy of the many orders of protection to the school principal and Carol's school psychologist as the school "had to know" why there was an order of protection. The
Father states therefore he had to discuss the Mother's alcoholism with school personnel.
In the original temporary order of protection issued by Judge Koenig, there was no "stay away" from the children's [*4]school. However, after a trial before Judge Koenig, he added the "stay away" to include the children's school and camp. (This is set forth in Court exhibit II which is the order of protection dated May 18, 2000).
The Father stated that according to Dr. Favaro, visitation at his facility was suspended due to the Mother's "inappropriate behavior;" after the third visit, Carol refused to go to any further visitation. The Father continued that according to Dr. Favaro, the children were filled with anger, hate, frustration and acting out; they did not want to go to visitation and sometimes the children refused to go into the room with the Mother at Dr. Favaro's visitation facility.
The Father was late on three occasions for visitation because of difficulty with the children since they did not wish to visit. However, this occurred only three times over a period of 7 or 8 months, compared with the Mother being late 4 or 5 times during the same period.
As the children grew older, their "carrying on" stopped, but the physical manifestations continued. The Father would send
letters to the school, and the children's teachers allowed them to make up homework and tests after the time they would otherwise be due.
On re-direct the Father stated he is employed as a school teacher with the New York City Board of Education. During the summer, the children go to sleep-away camp for 8 weeks; both children have been doing this since each has been 7 and one-half years old. During 2002, they left for summer camp on June 25, 2002 and returned home approximately August 19, 2002. Although the children were to have visitation with their Mother at Visitation Alternatives, this was impossible for the Father to do as the camp was in Pennsylvania, 3 hours and 15 minutes travel time each way and he could not take them out of camp for visitation. However, visitation at Visitation Alternatives was had 7 days after they returned from camp in 2002.
As long as the Father can remember, "there has always been an order of protection" against the Mother. This includes an order of Judge Koenig of July 7, 2000 (Petitioner's 1 in evidence which includes no visitation to the Mother).
Visitation at Visitation Alternatives was held from August 2002 until January 2003, always on a Tuesday, unless there was a [*5]doctor's appointment or the children were ill, in which case Visitation Alternatives held a make-up date for visitation. Sometimes the Father would be late because his employment was in Brooklyn and depending upon traffic, it would take him 1 to 1 1/2 hours to come home. He would always call Sue Silverstein at Visitation Alternatives if he was going to be late and he was never more than 15 minutes late.
The last time the children saw their Mother was January 2003. Since that date, Carol has stopped her twitching and Brian no longer has headaches, "except for an occasional [regular] headache." The last time Brian had to make up his homework was January 2003.
 TESTIMONY OF SUSAN SILVERSTEIN FOR THE MOTHER
This witness is a certified social worker and the principal of Visitation Alternatives, which is a therapeutic and also super-
vised visitation facility. On consent, she was qualified as an
expert in this field. The visits at her facility were from September 27, 2002 until January 29, 2003 and were generally weekly. The children were very resistant to visiting with the Mother, but the Mother was "very open" for help. Although the visits were separately between each child and the Mother, each child was "afraid," especially Carol. Brian displayed more anger and hostility towards his Mother, than did his sister. The Father would often upset the children, making remarks in front of them that hurt the children. For example, he stated that Visitation Alternatives staff were critical of the Mother and the Mother was not paying child support. According to this witness, such remarks were "horrible." The children are "clearly aligned" with the Father and they saw visitation as something "worse" than it actually was. Furthermore, the children had "very inappropriate knowledge" of many of the court proceedings, which were things that only the Father could have told them.
Although the Mother was open and receptive to suggestions, it was more difficult for her to modify her behavior. This is common with non-custodial parents, in the view of this witness. As of the date of her testimony the witness would like to restart visitation
but there would have to be a new assessment for Brian who is now 15 years old (as of the date of Ms. Silverstein's testimony). [It should be noted that on January 29, 2003, this Court suspended all visitation to the Mother. That oral order was reduced to a written order dated March 28, 2003, but effective January 29, 2003. It was based upon a report from Visitation Alternatives which was extremely disturbing regarding the Mother.]
During the Father's cross-examination of Ms. Silverstein, she stated that the Mother came to her visit on November 27, 2002
"inappropriately." It was the opinion of the case supervisor that the Mother had been drinking. In addition, Visitation Alternatives had cancelled that visit a few hours earlier, but the Mother appeared nevertheless. The Mother (and her father who accompanied her) were spoken to by personnel at Visitation Alternatives to be sure that the Mother had not been driving and to be sure that she would get counseling for alcoholism. This was the first and only time that Visitation Alternatives saw the Mother in this condition, although they were aware of her history of alcohol abuse.
Since this incident was the first time the Mother abused alcohol prior to a visitation, the visits were not terminated by Ms. Silverstein, especially since the Mother was receptive to
therapy and intervention and her visits had been consistent.
During the visits, the children were resistant and they would generally ignore the Mother during visits. Although all visitation ceased on January 29, 2003, if it were to begin again, it could be accomplished in a therapeutic setting.
This witness was always present during the visits; most of the Father's remarks regarding the Mother were made in the lobby when he first arrived and sometimes at the end, when he was leaving.
Upon cross-examination by the Law Guardian, Ms. Silverstein stated that the Mother needs psychiatric help including medi-cation, in order to modify her behavior. The Mother has a strong desire to "intergrate:" she knows what she needs to do intel-lectually, but it is hard for her to modify her behavior.
During the visits, Brian would express anger and the Mother would "shut down" if either of the children did not immediately respond. There was some slight improvement regarding the relation-ship between Carol and the Mother, where eye contact would be made and Carol became calmer.
The Father's behavior merely reinforced what the children [*6]were doing. The Father felt no necessity to modify his behavior and his
comments regarding the Mother. He is not "capable of change" as to how he views the Mother, he has no desire to change and he "believes he is in the right." The Father's actions "slow down" any progress that could otherwise be made. The Father's remarks regarding the Mother are angry, hostile and negative.
The Mother, during her visits, is appropriate, sincere in her desire to re-establish her relationship with the children and compliant with the staff. She has been able to modify her behavior during visitation.
The pain Carol experiences after visitation continued during the days following and it could affect her schoolwork. Therapeutic visitation would help the Mother and Visitation Alternatives is capable of accomplishing such visitation.
Carol has a need for consistency, including a Mother and a Father in her life. However, the Father is afraid that the children would be hurt by contact with the Mother. In this witness' opinion, the "positives" of therapeutic visitation "outweigh" the negatives; visitation always helps the children and should almost always occur.
The Father himself needs individual psychological therapy which would help him with the children, take away some of their fears and increase their relationship with the Mother.
The Father has never purposefully been late for visitation but sometimes he meets rush hour traffic on his way home from work, which is something over which he has no control.
In sum, it is this witness' belief that the therapeutic visitation process "absolutely" would be beneficial over time. One of the things troubling to this witness is that Brian would tell the Mother exactly what happened in the courtroom; and his only source could be from the Father. This witness addressed these concerns to the Father and told him it was inappropriate. He stated that he did not feel it was inappropriate, although he did not admit to doing it, but said that Brian should know what was happening.
The Father has been confrontational with staff, and [*7]"inappro-
priately so."
On re-direct by the Mother's attorney, Ms. Silverstein said that the Father spoke negatively to the children regarding Ms. Silverstein and Visitation Alternatives, that Brian spoke about Court documents and statements that the Father had made in Court,
and that the children knew what the Father would request of the Court at the next Court date.
On re-cross examination by the Father's attorney, the witness stated that the Father made "extremely inappropriate" comments regarding the court proceedings and denigrated the courtroom, this Judge, the Law Guardian and others.
The witness tried to alleviate the Father's fears, but could not; he did not wish help and considered himself "righteous." This witness concluded that the children should not have been aware of the court proceedings, as such information can be extremely detrimental to them.
 TESTIMONY OF THE FATHER'S WITNESS, T.B.
This witness is a clinical social worker at "A" High School. He was found qualified by the Court.
He first met Brian at his offices at the "A" High School on November 22, 1999. The referral was by "a combination" of the Father and the Assistant Principal of the middle school. This witness has sporadically met with Brian several times each year since 1999. The presenting issues were conflicts Brian was feeling
within the family, i.e., physically being with the Father and visitation issues with the Mother. These issues have continued over the years this witness has seen Brian. Brian is very unhappy regarding supervised visits with his Mother. He has headaches prior to each visit and subsequent to each visit, from the day before through the entire following day. Brian specifically spoke to the witness on one particular day about what had transpired in Court and what was to transpire on the following court date. Brian does not desire to have a relationship with his Mother; this witness stated that this very rarely happens between a child and a parent.
In this witness' opinion, the Mother can offer Brian nothing [*8]of value in their relationship and "his life is less complicated without her." His recommendation to Brian himself, though, was to try to help him cope and he did not recommend to Brian whether to visit, or not to visit, with his Mother. The coping mechanisms involved dealt with Brian's headaches, stress and the like.
On cross-examination of this witness by the Law Guardian, the witness stated that the Mother's alcoholism upset Brian greatly and he was frightened by a telephone call in 1999 from the Mother. The
witness concluded that "Brian functions remarkably well" despite all of his problems, his teachers like him and his maturity is slightly above that which is common for his age. On re-cross examination by the Mother's attorney, the witness confirmed that Brian does not wish to visit with his Mother and does not want adults (parents, the Court or others) to tell him what to do.
 TESTIMONY OF THE FATHER'S WITNESS, L.S.
This witness is a third grade teacher in the "B" Public Schools and had Carol as a student for the school year 2001 - 2002. The witness testified that whenever there was visitation with the Mother that this would result in acting out by Carol, including academic problems and physical fights with other children, and that she would "go off the handle."
At the beginning of the school year, Carol was very quiet and uninvolved emotionally, with "a wall" around her, but gradually during the year she improved, becoming "more available emotion-ally," smiling, and more open; she was a very bright student.
This witness testified as to one particular incident, approximately the middle of the year, when Carol went to the nurse and refused to go to the classroom. She wanted to go home, but was not allowed to, and she became hysterical in front of this witness. The reason for this was that there was going to be visitation with her Mother.
On cross-examination by the Mother's attorney, the witness [*9]stated that she believed Carol knew the Father was coming to court
to decide if visitation was to resume. However, the Father only told this witness whether there was visitation or not (in order to prepare the teacher for Carol's reaction), but nothing else.
On cross-examination by the Law Guardian, this witness stated Carol said to her that when she went to visitation she would not speak to the Mother, she would pretend that the Mother was not there, and that Carol "built a wall" for visitation (as a defense mechanism). This witness has remained friends with Carol and states that behind a tough exterior today she is a "very vulnerable, sweet little girl."
On the days Carol had visitation, she was "emotionally gone from the [class] room." Although she is a good writer, she could not produce on visitation days, when there was an "overall
worriness" and "a sadness" about her. Carol's academics improved from the beginning of third grade until visitation with the Mother started again.
This witness would see the Father for parent/teacher conferences, but there was nothing out of the ordinary. The Father is "working very hard to make this happen; where he is being a Father and a Mother." Other than advising the witness as to
whether there was visitation or not, the Father did not discuss the Mother with this witness.
On cross-examination by the Mother's attorney, the witness stated that even today Carol exhibits behavioral problems, such as "mouthing off and acting out."
 TESTIMONY OF THE FATHER'S WITNESS, C.A.K.
This witness is a fourth grade teacher in the "A" School District and had Carol as a student for the academic year 2002 - 2003. From the beginning of the school year until early February, 2003, Carol was slightly behind in her schoolwork, was achieving below her grade level and struggling at school. However, as of February 2003, her desire to learn had changed for the good, and
she further changed from being withdrawn and argumentative with adults and peers to being more open with such persons and dealing [*10]better with them. By the end of fourth grade, she was performing at grade level.
On cross-examination by the Mother's attorney, the witness stated that Carol began therapy in January 2003, at which time her
academics increased "all of a sudden" and continued to increase during the rest of the school year. The Father did discuss the court proceedings with this witness when she would ask him "how everything went," so that the witness would know what to expect from Carol. However, Carol's behavior was affected when there was an upcoming court date. Carol knew when a court date was approaching, but did not know the reason for that court date, except that it was about visitation.
On cross-examination by the Law Guardian, the witness stated that Carol went from an unhappy and lonely child at the beginning of the school year to a more relaxed, friendly person as of late January 2003. Visitation was on Tuesdays, at which time Carol would be withdrawn and not participate. On Wednesdays following each visitation, she would be visually upset, would cry and
frequently ask to go to the nurse where she would stay until she became "relaxed." She would miss schoolwork during the time she spent with the nurse.
In conversations this witness had with the Father throughout the school year, he was always appropriate and said nothing about the Mother.
 TESTIMONY OF THE MOTHER, L.W.
At the beginning of this witness' testimony, which was January 12, 2004, the Mother had no visitation by Court order and last saw the children at Visitation Alternatives on January 22, 2003. On
October 10, 2001, the Court, by a prior Judge, ordered supervised visitation at Smart Parenting, and before that she had undergone "an assessment" with Dr. Peter Favaro. [This Court notes that the order testified to was a temporary order of visitation dated October 25, 2001, effective October 10, 2001, and is Respondent's exhibit A in evidence.]
Between October 2001 and August 2002, there was no visitation because the Father did not respond to Dr. Favaro, nor did he cooperate. The Mother was forced to bring a writ before the Court
in April 2002, at which time visitation was reinstated at Visi-tation Alternatives. Between April 2002 and August 2002, the children were brought for "assessment" to Susan Silverstein.
The Mother admits that she has a criminal conviction in Domestic Violence Court for "making a phone call" on March 21, 2002. She would like the current order of protection against her vacated. At the beginning of the visits at Visitation Alterna-tives, the visits were "rocky" because the children had not seen her for awhile; thereafter, the visits were suspended.
The Mother has been in individual therapy at Lifeline Counseling in Rego Park for anger management and domestic violence issues. She has also undergone urine testing and she tested posi-tive for barbiturates. She is now receiving therapy at the Flushing Medical Center due to a recommendation from probation in the Domestic Violence Court. She states that she is still randomly tested by breathalyzer and that she never missed a test.
Although visitation was stopped, she never was intoxicated at Visitation Alternatives. Regarding the Thanksgiving visit, she did not receive the message from Visitation Alternatives and therefore appeared on that date. She had been served by a process server
shortly before a visit, which resulted in a "personality change" due to her being upset, and perhaps that is why Visitation Alterna-tives thought she had been drinking.
The petition she has before the Court is to receive copies of the children's school and medical records and to vacate the order of protection. She also is requesting that the Father not "bad mouth" her and she is seeking regular visitation from the Court.
Upon cross-examination by the Father's attorney, the Mother stated that she is not in therapy to address her prior alcoholism issues, since she "conquered" those issues three years ago. She
has not had one drink for over two years.
The barbiturate she tested positive for was a sleeping pill she took in January 2003, which pill she received from her Mother. On March 21, 2001, she was convicted in Domestic Violence Court and sentenced on August 22, 2001 to probation for three years. [This Court is aware that this witness previously testified that the incident was a year later.] In addition to the usual conditions of probation, she was to attend therapy at [*11]the Flushing Medical Center. She pled guilty to the allegation of making a telephone call to the Father's home, which was in violation of a Family Court
order which prohibited telephone calls.
On cross-examination by the Law Guardian, the Mother stated that visitation at Smart Parenting had been suspended by the prior Judge and then reinstated by him. The visitation was always supervised and had lasted several years.
The prior Judge found against the Mother after a hearing which resulted in the order of protection dated May 18, 2000 (Court exhibit II in evidence), and which was a three year order. During the visits at Visitation Alternatives, the Mother allowed the children "to validate their feelings." However, when Brian once called her "a piece of dirt" when he was 14, during 2003, she told him that such a remark was inappropriate and a child should not say that to his Mother. Validation is a positive thing but must be appropriate, and the definition given by the Mother is that it means to let the children have their say and then react in a positive manner.
The Mother has been in therapy since January 14, 2003, and prior to that she was in individual counseling from 1997 to 1999. She received a bipolar diagnosis.
She stated that her lack of relationship with the children is not due whatsoever to her, and that it is all due solely to the
Father's "actions or words."
When the parties were all living together, the Mother never drank in front of the children, but she admits that she is a "recovering alcoholic." Regarding TASC's information to the Court that she refused to be tested, she attributes this to "a communi-cation gap" which occurred while she was waiting to change her therapy from Lifeline to the Flushing Medical Center. She had been tested by TASC until then, she was never non-compliant, and the "miscommunication" was on the part of both TASC and the Mother.
On re-direct by the Mother's attorney, the Mother stated that the miscommunication was straightened out by TASC. During visita-
tions, the children made comments to the Mother that could only [*12]have come from the Father to the children. The Mother further testified that she does accept some of the responsibility for the lack of relationship with the children. At Flushing Medical Center, she states that her diagnosis was "a social disorder," and that she was given a diagnosis only so that her visits could be paid by insurance. She states that this is the most "benign" diagnosis there is.
On re-cross examination by the Father's attorney, the Mother stated that the reason visitation had been stopped at Smart Parenting was because she gave her daughter hugs and kisses, the daughter was resistant and Smart Parenting told her not to act in that manner. The Mother thought that it was appropriate, since children need a Mother's love and affection.
At this point in the Mother's testimony, a tape was authen-ticated by the Father. The message was from June 2, 2001 and the Father stated that he was "one hundred percent sure" it was the Mother's voice. During that telephone call to the Father's home, the person calling stated she was a social worker. The Mother denies that she made that call.
The Mother states that every time visitation was resumed, it was then stopped and she had to "start from square one again." She further stated that during visitation there was an improvement with her relationship with the children.
 TESTIMONY OF THE CHILDREN
The children were questioned in camera at a Lincoln hearing (Lincoln v Lincoln, 24 NY2d 270 (1969)), with only the Law Guard-ian, the Court and Court personnel present. This Court has taken
extensive notes as to the children's testimony but, of course, will not and cannot reveal it in this decision.
 TESTIMONY OF THE MOTHER'S WITNESS, L.R.
This witness is the Mother's current therapist, whom she has been seeing since September 2003 at the Flushing Medical Center, based upon the referral by the Criminal Court probation officer.
The Mother's attendance has been "consistent." Her diagnosis is an "adjustment disorder," which is a mood disorder with a "clear [*13]precipitant," namely, the loss of visitation rights which causes depression. The Mother is on medication for depression and anxiety. The therapy includes relapse prevention and dealing with issues of the loss of the children, self-esteem and financial and vocational issues.
The Mother has been improving in therapy, is less "scattered," less depressed and more stable.
 LAW GUARDIAN
The Law Guardian, in her post-trial memorandum, urges that this Court not allow any visitation whatsoever to the Mother.
The Law Guardian stresses the physical and psychological mani-festations exhibited by the children before and after each visita-tion, when there was visitation, first with Dr. Peter Favaro and then at Visitation Alternatives. The Law Guardian stresses the testimony of the witnesses, including those from the children's school, and concludes that it is in the best interests of each of the children not to have any visitation whatsoever. The Law Guardian further stresses that once visitation ceased, virtually all of the physical and psychological manifestations exhibited by the children also ceased.
 DISCUSSION AND ANALYSIS
As set forth at the beginning of this decision and order, Action No. 3 is a petition brought by the Mother, requesting a modification of this Court's order of supervised visitation (the order dated August 29, 2002), claiming that the Father is alien-ating the children from her, and in which she requests that the Father undergo therapy and that she be given the children's school records and samples of their schoolwork through the current visi-tation facility. Regarding Action No. 3, this Court must use as
its starting point that order, which allowed for the most restrictive type of visitation, therapeutic visitation at Visitation Alternatives, and must determine whether there has been a change of circumstances or not in order to modify that order. With the consent of all parties, this Court did not bifurcate these matters.
[*14]
There were only two witnesses for the Mother: the Mother herself, and her current therapist, J.R. This Court is aware that
the expert that the Mother wished to have presented to this Court, became seriously ill and was unable to testify. That witness, it appears, was a therapist or psychologist who has been treating the Mother for quite some time, whereas J.R. had known the Mother for only approximately one year, as of the date of J.R.'s testimony. None of the testimony presented by the Mother has proven to this Court any change of circumstances sufficient to modify this Court's order. J.R., although credible, simply did not provide sufficient relevant testimony, nor, in this Court's opinion, could she in the circumstances. See Matter of Timson v Timson, 5 AD3d 691 (2d Dept 2004).
In addition, the Mother offered no testimony whatsoever to show this Court that the Father has any need whatsoever to "undergo
therapy" himself. However, the Court notes that the Father's testimony is clear, that both he and the children have been attending therapy on a regular basis.
Due to this failure of proof, Action No. 3 is dismissed.
Action No. 4 is a contempt proceeding brought against the Mother pursuant to an order of this Court dated September 15, 2003, in which it is alleged that the Mother failed to comply with TASC. There was no testimony nor evidence whatsoever by or on behalf of
the Father or the Law Guardian to set forth a prima facie case. Accordingly, Action No. 4 is dismissed.
This now leaves Actions Nos. 1 and 2, concerning the Father's request to extend the prior order of protection, as well as the Father's request to modify the prior order of this Court, dated August 29, 2002, which allowed for supervised visitation, to be modified to delete all visitation as to the Mother regarding both children.
The children's teachers and social worker were unanimous in stating that each child was extremely unhappy with any visitation
whatsoever to the Mother and this caused physical and [*15]psychological manifestations immediately before, and immediately subsequent to, each visitation. However, once visitation ceased, these manifes-
tations disappeared.
Placed into evidence as Petitioner's exhibit III was a certain tape recording, which the Father alleges was a telephone call from the Mother to the children's home, in which the Mother represented herself to be a social worker. The Mother denies this call. The Court finds that the telephone call was in fact made by the Mother, in violation of court order, and that the Mother misrepresented herself, both to the children and to this Court, for her own selfish ends.
The Court further takes notice of the fact that the Mother was found guilty in criminal court to making a telephone call to the Father's home, in violation of an order of protection against her and in favor of the Father.
Lastly, the Court notes the order of Judge Koenig dated
May 18, 2000 which, after a hearing, granted a three year order of protection against the Mother and in favor of the Father, which included a finding of aggravating circumstances.
The Court finds that, contrary to the Mother's assertions, the Father has not alienated the children; rather, it is the Mother
herself, by her actions over the years, including one appearance at Visitation Alternatives when she was under the influence of alcohol, who has done so. Her guilty plea in criminal court, her telephone call to the home misrepresenting herself as a social worker, and the finding by Judge Koenig which resulted in a three year order of protection against her, all show to this Court that it is the Mother herself who has been responsible for the aliena-tion.
This Court does find that the Father has apparently kept the children apprised of Court proceedings, at least in so far as Court
dates are concerned, but nothing more. Although this Court will not in this decision state what the children have told it in their in camera Lincoln hearing, the Court is satisfied that the children's testimony to this Court was voluntary and there was no undue pressure from either parent regarding their testimony. The children each testified truthfully and forthrightly, in this Court's opinion.
This Court is aware that the testimony of Susan Silverstein of Visitation Alternatives recommended that supervised visitation with
the Mother continue. However, even the Mother's own therapist
stated, in effect, in this Court's opinion, that in the short time that the therapist has treated her, that there has been no progress.
 APPLICABLE LAW
Although at least one of the memoranda submitted to this Court stressed that the standard is best interests of the children, nevertheless, the initial inquiry this Court must make is whether the Father has shown changed circumstances or not. If he has in fact proven changed circumstances, then, and only then, can this
Court address the best interests of the children. The law in this State is that the "change of circumstances," which is routinely applied to a modification of a custody order, likewise must be applied to a visitation matter. Engwer v Engwer, 307 AD2d 504 (3d Dept 2003) and Mack v Grizoffi, 13 AD3d 912 (3d Dept 2004). The Court finds that the Father has met his burden as to a change in circumstances.
One of the other factors which this Court is obligated to consider is set forth in Domestic Relations Law §240(1)(a) which states in applicable part:
where either party to an action concerning
custody of or a right to visitation with a
child alleges in a sworn petition or com-
plaint or sworn answer, cross-petition,
counter-claim or other sworn responsive plead-
ing that the other party has committed an act
of domestic violence against the party making
the allegation or family or household member
of either party, as such family or household
member is defined in article eight of the family
court act, and such allegations are proven by
a preponderance of the evidence, the court must
consider the effect of such domestic violence
upon the best interests of the child, together
[*16]
with such other facts and circumstances as the
court deems relevant in making direction pur-
suant to this section.
Introduced into evidence as Court exhibit I, is the three year order of protection entered after a hearing by Judge Koenig. It is incumbent upon the trier of the facts to consider any alleged acts of domestic violence committed by one parent against the other, and the failure to do so generally is reversible error. Finkbeiner v Finkbeiner, 270 AD2d 417 (2d Dept 2000) and Samala v Samala, 309 AD2d 798 (2d Dept 2003). Even though these two cases deal with an
issue of custody, nevertheless, they are equally applicable to visitation matters. See Engwer v Engwer, supra .
In addition, the Court's consideration of domestic violence must be a searching one. See for example, Wissink v Wissink, 301
AD2d 36 (2d Dept 2002). In that case, the Second Department stated at page 39 that "the Court must consider the effect of such dom-estic violence upon the best interest of the child, together with other factors and circumstances as the Court deems relevant in making an award of custody."
A Judge of this Court previously made a finding against the Mother (Court exhibit II in evidence) by order dated May 18, 2000, which included a complete "stay away" regarding both children, and that Judge found aggravating circumstances and therefore issued a three year order with no visitation whatsoever. The applicable law is that when aggravating circumstances are found and a three year order is issued, the Court must state the reasons for such finding and the reasons need to be supported by the evidence. Walsh v Walsh, 251 AD2d 338 (2d Dept 1998). This Court notes that the order of another Judge dated May 18, 2000 was never appealed, and in fact has now expired. In addition, the finding against the
Mother exists, whether it be for one year or three years.
 It has been held that if the record itself shows aggravating circumstances (as found by the prior Judge) then the three year order (subsequently changed to five years, see FCA [*17]§842 and
§827(a)vii) may be upheld even if the Judge in the order did not specifically state the nature of the aggravating circumstances in accordance with the statute. Muller v Muller, 221 AD2d 635 (2d Dept 1995). In Muller, the Appellate Court searched the record and found that aggravating circumstances did exist, even though the Court's order did not set forth specific aggravating circumstances. The Appellate Court therefore modified the order of protection to include such findings. (However, see Rice v Rice, 280 AD2d 677 (2d Dept 2001), wherein the Family Court issued a final order of protection until the child's eighteenth birthday. On appeal, the order was modified to be in effect for only a one year period of time, where the Family Court did not set forth the nature of the aggravating circumstances.) In the case at bar, this Court has not been shown the factual basis for a finding of aggravating circumstances; nevertheless, the order of protection, in and of itself, is something which must be thoroughly reviewed by this
Court so that it is one of the elements in this Court's decision. See Wissink v Wissink, supra .
Regarding the Father's instant application in Action No. 1,
the Father requests an "extension" of the then existing order of
May 18, 2000. In order for this Court to grant that relief, FCA §842 requires a finding of "special circumstances." There is a dearth of case law as to the definition of "special circumstances." However, the statute specifically states that if the extension is
granted, that it may be for "a reasonable period of time." The statute is interesting in that regard, inasmuch as it is not necessary for the Court to make a finding of aggravating circum-
stances (which could result in a five year order under current law FCA §842) but only that the extension be "reasonable" in the cir-
cumstances. Accordingly, this Court is free to extend Judge Koenig's order of protection (as extended by this Court on a temporary basis prior to its expiration and through the date of this decision) to whatever reasonable date this Court deems appropriate.
 The law is that this Court's decision cannot be based solely upon the wishes of the children. Eschbach v Eschbach, 56 NY2d 167
(1982); and Matter of Christopher D. Gonzalez, 2005 NY App Div
Lexis 1591 (2d Dept 2005). All things being equal, the non-custodial parent is entitled to reasonable visitation, and a "denial of those is so drastic it must be based upon substantial
evidence that visitation would be detrimental to the welfare of the child." In the Matter of Erik L. v Dorothy L., 130 AD2d 660 (2d Dept 1987). However, the wishes of the children, especially chil-dren of the age of the parties' children, should be given weight. Sturm v Lyding, 96 AD2d 731 (4th Dept 1983); Mahler v Mahler, 72 AD2d 739 (2d Dept 1979); In the Matter of Erik L., supra at pages 660-661; and In the Matter of Kachelhofer v Wasik, 10 AD3d 366 (2d Dept 2004).
Furthermore, the older the child is the more weight should be given to his preference, although, again, his preference is not determinative. The leading case in this area is Eschbach v Eschbach, supra , in which the Court of Appeals stated at p. 172 "while not determinative, the child's expressed preference is some indication of what is in the child's best interests. Of course, in weighing this factor, the courts must consider the age and maturity of the child" (emphasis supplied).
In this matter, there was one expert, Susan Silverstein from Visitation Alternatives, who recommended that therapeutic visita-tion be resumed. However, the Court is not obligated to accept a recommendation either from an expert (Ms. Silverstein) nor even the
Law Guardian, so long as the Court's decision has a sound and substantial basis in the record. Sienkwicz v Sienkwicz, 298 AD2d 396 (2d Dept 2002); (affirming Family Court, Nassau Cty., Lawrence, J.); leave to appeal den'd 99 NY2d 503 (2002).
Regarding when visitation itself should be expanded or con-tracted (or even totally suspended), the factors which help deter-mine custody issues are likewise applicable to visitation issues. Engwer v Engwer, supra .
It is well-settled that a moving party seeking a change in custody must show a sufficient change in circumstances reflecting a real need for change in order to insure the best interests of the child. Canrike v Kasson, 291 AD2d 680 (3d Dept, 2002); and Fox v
Fox, 177 AD2d 209 (4th Dept, 1992). The law is also well-settled that the Court will not alter a custody arrangement unless the non-
[*18]
custodial parent demonstrates that there is a sufficient change in circumstances which shows a real need to effect a change in order
to insure the best interests of the child. See McCauliffe v Peace, 176 AD2d 382 (3d Dept, 1991); and Winslow v Lott, 295 AD2d 620 (2d Dept, 2002).
Here, this Court finds that changed circumstances have been proven, namely that subsequent to the order of custody and visi-
tation dated August 29, 2002 (Court exhibit I in evidence), which allowed therapeutic visitation at Visitation Alternatives, Inc., that the children have continued to suffer greatly, both psycholog-ically and with physical manifestations; that the Mother's brief contact with the children at Visitation Alternatives has been totally inappropriate (such as when she appeared for visitation under the influence of alcohol); where the Mother admittedly has
violated an order of protection and was found guilty of disorderly conduct in the criminal court; and where a final order of pro-tection was issued by another Judge of this Court against the Mother for a period of three years, denying all visitation to her.
The Court must also consider DRL §240(1)(a) as a factor in its determination.
It is well-settled law in this state that, in an award of custody (or visitation, see Engwer v Engwer, supra ), the Court must
determine what is in the children's best interests, from a totality of the circumstances; there is no one factor, in most cases, which is determinative in making such an award. Eschbach v Eschbach, supra ; and Keating v Keating, 147 AD2d 675 (2d Dept 1989); appeal dismissed, 74 NY2d 791 (1989).
Among the factors which the Court must consider are the quality of the home environment and the parental guidance that the
custodial parent provides for the child. Eschbach v Eschbach, supra ; Matter of Ebert v Ebert, 38 NY2d 700 (1976).
Another consideration is the relative fitness of each of the parents and the length of time that the current arrangement has [*19]been in effect. Matter of Nehra v Uhlar, 43 NY2d 242 (1997). 
One of the leading cases in this area is Kresbach v Gallagher, 181 AD2d 363 (2d Dept 1992), appeal denied 81 NY2d 701 (1992); see also Eschbach v Eschbach, supra ; Ring v Ring, 2005 NY App Div Lexis 1356 (2d Dept 2005) and Vann v Vann, 789 NYS2d 261 (2d Dept 2005). All of these cases stress that one of the important elements for the Court's consideration is the length of time the present custody
(and visitation-see Engwer v Engwer, supra ) arrangement has been in effect.
In this regard, the Mother has had either absolutely no contact with the children, under a series of court orders from
May 18, 2000, or the barest minimal contact by way of therapeutic visitation at Smart Parenting for only several visits, at which
time Smart Parenting suspended visitation due to the Mother's inappropriate behavior and thereafter absolutely no contact, followed by only five months of therapeutic visitation at Visitation Alternatives. Again, on January 29, 2003, this Court directed that all visitation cease, based upon an extremely troubling and detrimental report from Visitation Alternatives regarding the Mother's behavior. Therefore, the Mother has had virtually no visitation or contact, except for therapeutic visita-tion, for a period of approximately 5 to 6 months in total, for almost five years.
Also important is the effect that an award of visitation to one parent might have on the children's relationship with the other parent. Bliss ex rel Ach, 56 NY2d 995 (1982); and Young v Young, 212 AD2d 114 (2d Dept 1995).
The willingness of a parent to encourage visitation with the other is also an important matter to be taken into account in an
award of custody. Young v Young, ibid. In this, the Court notes Court exhibit I, in which the parties agreed to therapeutic visitation at Visitation Alternatives, per order dated August 29, 2002. Clearly, the Father had no desire to suspend all visitation with the Mother.
An additional consideration is the parents' conduct. [*20]Saunders v Saunders, 60 AD2d 701 (3d Dept 1997); Matter of DeLosh v DeLosh, 235 AD2d 851 (3d Dept 1997); appeal denied, 89 NY2d 813 (1997); Matter of Alice A. V Joshua B., 232 AD2d 777 (3d Dept 1996). The Court may, and in this case does, take into consideration the
Mother's pattern of immature decision making. Markey v Bederian, 274 AD2d 816, (3d Dept 2000). In Markey, the mother abused alco-
hol, just as this Court finds the Mother did on one occasion at Visitation Alternatives. This Court also has found that the Mother telephoned the children's home, pretending to be a social worker; and that she also pled guilty to violating an order or protection.
Furthermore, the Law Guardian recommends that there be no visitation to the Mother. This Court is well aware that a denial
of visitation is a drastic matter and should be sparingly used (In the Matter of Erik L. V Dorothy L., supra ), and only in appropriate circumstances where the best interests of the children determine that there be no such visitation. In the case at bar, the Mother's visitation, or lack of it, was as follows:
a) order of Judge Koenig dated May 18, 2000 (Court exhibit II in evidence); an affirmative finding against the Mother on a family offense matter after hearing, including a complete "stay away" from
the Father and children, their home, school, camp and "wherever
they may be; "no communication" with the Father and the children and a "general refrain" as to the Father and the children; together with a finding of "aggravating circumstances," making the order a three year order until May 18, 2003;
b) final order of custody of Judge Koenig dated July 7, 2000 entered after trial (Petitioner's exhibit I in evidence), ordering that the Mother "shall have no contact whatsoever with Brian and/or Carol either by visitation, writing or telephone; and that the Mother further "shall not directly or indirectly communicate with the children's schools, camps nor may she receive any communi-
cation or information from them;" and further ordering that physical and legal custody of the children "shall remain with" [*21]the Father;
c) temporary order of custody and visitation per Judge Koenig dated October 25, 2001 and effective October 10, 2001 (Respon-dent's exhibit A in evidence), granting legal and physical custody of the children to the Father and allowing the Mother "therapeutic visitation" at Smart Parenting, (Respondent's A in evidence)[the Mother testified that she never had any visitation at Smart Parenting; the Father testified that there were only several visits before Dr. Favaro suspended them.];
d) final order of custody and visitation per this Court dated August 29, 2002 on consent, allowing the Mother therapeutic visita-
tion with both children at Visitation Alternatives, Inc. (Court exhibit I in evidence); and
e) order of this Court dated April 23, 2003 and effective January 29, 2003, suspending all visitation rights of the Mother until further Court order.
Although it is well-settled law that a non-custodial parent should have a reasonable right of visitation, that right may be
denied upon "substantial evidence" or upon "compelling evidence," that such visitation would be detrimental to the child's welfare,
and where visitation would affect the child's emotional well-being. See MacEwen v MacEwen, 214 AD2d 572 (2d Dept 1995), where the trial court's denial of visitation was affirmed, where the record showed an in camera interview with the child, testimony from various
witnesses, and where the determination had a sound basis in the record.
Where visitation caused a child anxiety and weight loss, the Appellate Court affirmed the trial court in finding that there was substantial evidence to support the Court's conclusion that visitation between the child and the Father should be denied. Nacson v Nacson, 166 AD2d 510 (2d Dept 1990).
A father was denied visitation where his behavior was inappropriate during the rare occasions he visited; the court found, by "compelling evidence," that such visitation was detri-mental to the child's welfare. Matter of Rueben D.R., 302 AD2d 234 (1st Dept 2003).
The same issue has arisen within the context of an Article 10 proceeding, where the trial court denied all visitation to the
[*22]
father, including even therapeutic visitation. The court found visitation would not be in the children's best interests, at least
until the parent successfully completed various treatment programs; the Appellate Division affirmed. In the Matter of Tanya T. v Steven U., 252 AD2d 677 (3rd Dept 1998); appeal denied 92 NY2d 812 (1998). In the matter at bar, the Mother has failed to prove that
her therapy has afforded her the right to visitation. Furthermore, she initially testified that all of her lack of relationship with children is not due whatsoever to her, but only due solely to the Father. This Court finds otherwise.
It has been held that it is a "priority" to "maintain and promote the stability in the child's life" regarding custody and, per Engwer, supra , visitation. Matter of Kulakowich v Zingarelli, 249 AD2d 306 (2d Dept 1998). In the matter at bar, the mother has not had visitation, with the exception of several months, for about 5 years; the stability in the children's lives, together with the other factors found, dictate that such stability (i.e., no visitation) be maintained.
Where one parent's actions resulted in an adverse psycho-logical and emotional impact on the child, the appellate court held
that the trial court correctly found changed circumstances and cor-rectly changed custody. In the Matter of Smith v Miller, 4 AD3d
697 (3d Dept 2004). The same criteria govern a visitation matter. See Engwer v Engwer, supra .
Finally, the trial court was affirmed when it changed custody, based upon the child's poor grades and disciplinary problems in
school when with one parent, compared with the child's improvement when with the other parent. In the Matter of Hagans v Harden, 12
AD3d 972 (3d Dept 2004). Again, this reasoning is applicable to a visitation proceeding (Engwer v Engwer, supra ). In the matter at bar, the children, and especially Carol, manifested physical problems and school problems with respect to every visitation. As soon as visitation ceased, these problems all disappeared.
 DECISION
The Mother's petition requesting a modification of this Court's order of visitation is denied for a failure of proof, and [*23]the contempt proceeding against the Mother likewise is dismissed for a failure of proof.
With respect to the Father's petition to modify this Court's order dated August 29, 2002, which allowed for the Mother to have
therapeutic visitation with the children at Visitation Alterna-
tives, this Court finds by a fair preponderance of the credible evidence, that a change in circumstances has been proven and, by compelling and substantial evidence, that the best interests of the children are that all visitation with the Mother be terminated. As
soon as visitation was in fact suspended by this Court on January 29, 2003, the Father's witnesses all testified that almost immedi-
ately, the children's anxiety, physical manifestations and acting out behaviors ceased. Again, this Court has taken into account the in camera testimony of the children, but will not repeat it here, even by way of summary. Brian was born April 14, 1988 and therefore has just reached 17 years of age as of the date of this decision, and Carol was born December 13, 1992, and is now 13 years of age. Due to the ages of the children, and especially that of Brian, their testimony should be given considerable weight, although it is not determinative.
The Father's application to extend the order of protection is granted for a "reasonable period of time," in accordance with FCA
§842. This Court finds that such reasonable period of time shall be until the respective eighteenth birthday of each of the chil-dren. Unlike a finding of aggravating circumstances (FCA §842),
which can result in an order for up to five years under the current law, this Court is not limited to any specific number of years, so long as it is "reasonable" in the circumstances.
 ORDER
It is hereby
ORDERED that L.F.W. against J.R.W., Index Nos. V- & V- [*24](ACTION #
3) and J.R.W. against L.F.W., Index Nos. V- & V- (Action #
4) are dismissed with prejudice; and it is further
ORDERED that the Father shall continue to have custody of each of the two children and there shall be no visitation to the Mother;
and it is further
ORDERED that the final order of protection of May 18, 2000 shall be extended until each of the children are eighteen years of
age. Accompanying this decision and order and made a part hereof
is a copy of such final order of protection, with the same terms
and conditions as the original final order, suitable for trans-
mittal to the Domestic Violence Registry.
This constitutes the Findings, Decision and Order of the Court.
Dated: Westbury, New York
 April 18, 2005
Pursuant to Section 1113 if the Family Court Act, an appeal from this order must be taken within 30 days of receipt of the order by appellant in Court, 35 days from the date of mailing by the Clerk of the Court, or 30 days after service by a party or the law guardian upon the appellant, whichever is earliest.